UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEVIN GREEN,<br><br>Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | Civil Action No. 14-4228 (JLL)<br><br>OPINION |

**LINARES**, District Judge.

Currently before the Court is Plaintiff Kevin Green ("Plaintiff")'s appeal of Administrative Law Judge ("ALJ") Richard West's decision denying Plaintiff's application for supplemental security income. The Court has considered the submissions made in support of and in opposition to the instant appeal and decides this matter without oral argument. Fed. R. Civ. P. 78. For the reasons set forth below, the Court remands for further proceedings consistent with this opinion.

I.  **BACKGROUND**

A.  <u>Plaintiff's Physical Impairments</u>

Plaintiff maintains that he was disabled from November 27, 2006 through April 15, 2009, the day before he was able to return to work as a case manager. (R. at 527).[1] Plaintiff's impairments are set forth below, chronologically, based upon the medical evidence contained in the record.

---

[1] "R." refers to the pages of the Administrative Record.

Plaintiff began seeking treatment from Thalody Medical Associates in 2004 for bone pain. (*Id.* at 341, 497-98). A bone density test was performed and revealed no left hip bone density loss, but showed evidence of osteopenia. As a result, Dr. Thalody recommended that the Plaintiff take calcium supplements. (*Id.*). Plaintiff was treated for pain in his hips in August 2006, at which point, tests results revealed no bone density loss and minimal osteoarthritis. (*Id.* at 343). Dr. Thalody prescribed medication and physical therapy for Plaintiff's bone pain and muscle spasms. (*Id.* at 263-65, 333).

Plaintiff suffers from a seizure disorder. As such, in 2005, Dr. Thalody prescribed Dilantin and phenobarbital for the treatment of said disorder. (*Id.* at 339).

Plaintiff also suffers from HIV. Medical records reflect that in 2005 his HIV was under control and his viral count was undetectable. (*Id.*).

In October 2005, Plaintiff was treated at Trinitas Hospital Emergency Room for a headache and followed up with Dr. Thalody who ordered an MRI, which revealed no harmful results. (*Id.* at 196). At a February 2006 appointment with Dr. Thalody, Plaintiff again complained of headaches and was given a referral to seek treatment from a neurologist. (*Id.* at 494-495). Subsequently, Plaintiff underwent an EEG in March 2006; his results were normal. (*Id.* at 195). At Plaintiff's February 2006 appointment with Dr. Thalody, the physician completed a disability form for one year—from February 20, 2006 through February 20, 2007. (*Id.* at 494).

On December 8, 2006, Plaintiff sought treatment at Trinitas Hospital Clinic, complaining of palpitations, anxiety, memory problems, and an inability to focus. (*Id.* at 202). Plaintiff was diagnosed with medication toxicity due to elevated levels of Dilantin in his blood, and was advised to not take the medication for 2 days. (*Id.* at 206-214).

On December 28, 2006, Plaintiff completed a Seizure Questionnaire, a Function Report, and a Disability Report. (*Id.* at 100-01). Plaintiff reported that he was having multiple seizures every month for the last 6 months, but could not indicate how long the seizures lasted. (*Id.*). The same seizure questionnaire was sent to the Plaintiff's case manager, per the state agency's request, and the case manager indicated that she had not witnessed any of Plaintiff's seizures, but was aware that he was taking medication to treat a seizure disorder. (*Id.* at 102). In the Function Report, Plaintiff indicated that he had no limitations caring for his personal needs, used public transportation to travel, was able to cook himself dinner, and was able to remember to take his medication without assistance. (*Id.* at 103-12). Plaintiff listed his daily activities as including: making breakfast, taking his medication, going to church, resting, attending doctors' appointments if necessary, reading the bible, attending spiritual groups, and cooking himself dinner. (*Id.*). Plaintiff further indicated that his impairments affect his ability to lift, walk, climb stairs, understand, squat, squat, sit, bend, kneel, stand, talk, reach, and concentrate. (*Id.*). Additionally, Plaintiff noted that his impairments affect his memory, ability to follow directions, and complete tasks. (*Id.*). The Disability Report shows that Plaintiff last worked in December 2000, and that the employment was discontinued because it was temporary. (*Id.* at 122).

The Plaintiff, who suffers from Hepatitis C in addition to his seizure disorder and HIV, is also seen by Dr. Uwe Schmidt, a physician at the HIV Services – Early Intervention Program at Trinitas Hospital. (*Id.* at 125). Dr. Schmidt regularly monitors Plaintiffs blood levels, and in March 2007 a blood test showed Plaintiff's HIV was under control, with a CD4 of 666 and a viral load of less than 50. (*Id.* at 379). In July 2007, Plaintiffs test results show a CD4 of 877 and a viral load of less than 50. (*Id.* at 375-76). A January 2008 blood test revealed a CD4 of 725 with a viral load of less than 50, and a follow up blood test in August of 2008 showed a CD4 of 739 and a viral load

of less than 50 as well. (*Id.* at 465, 475-76). Plaintiff's final relevant blood test performed in February 2009 showed a CD4 of 794 and a viral load of less than 48. (*Id.* at 455-56).

At the July 2009 hearing, Plaintiff testified that his HIV, Hepatitis C, and seizures prevented him from working during the relevant time period. (*Id.* at 31).

B.  Mental Impairments

In October 2006, Plaintiff was seen at the Trinitas Hospital Department of Behavioral health for an intake assessment. (*Id.* at 413). According to the Plaintiff, at that time he lived alone in an apartment and performed daily activities such as Bible reading, spiritual readings, attending AA meetings, volunteering with HIV patients, and speaking at schools regarding HIV and AIDS prevention. (*Id.* at 413-23). At the time of intake, Plaintiff also indicated that he graduated from high school, was in the Army for a year and a half, worked in the past as a welder, but was currently unemployed. (*Id.* at 113, 416). The intake clinician indicated that Plaintiff was calm, cooperative, well groomed, and had a neutral mood. (*Id.* at 419). She also noted that Plaintiff's intelligence was average, his attention, concentration, and judgment were good, and his thought process was intact. (*Id.*). Additionally, the intake clinician reported that Plaintiff's speech was normal, his memory and cognition were intact, and his insight was fair. (*Id.*). Plaintiff also reported that he was not experiencing hallucinations. (*Id.*). The intake clinician diagnosed Plaintiff with generalized anxiety disorder, and set out a treatment plan which included developing coping skills to decrease anxiety and depression, and to feel comfortable in social situations. (*Id.* at 422). The clinician assigned a GAF score of 61. (*Id.*). As a result of the assessment, Plaintiff agreed to meet for therapy on a weekly or bi-weekly basis, but refused to take any psychiatric medications. (*Id.* at 313). In December 2006, in response to a request for documentation regarding the Plaintiff made by the Division of Disability Determination Services, Plaintiff's case manager wrote a letter stating

4

that Plaintiff was receiving treatment for AIDS, HIV, chronic Hepatitis C, extreme anxiety, and depression at Trinitas Hospital. (*Id.* at 309).

In January 2007, Plaintiff received a psychiatric evaluation at Trinitas Hospital in the Department of Behavioral Health and Psychiatry. (*Id.* at 318). Records indicate that Plaintiff was cooperative, well groomed, retained adequate judgment, and had good frustration tolerance and impulse control. (*Id.*). Additionally, the evaluating psychiatrist noted that Plaintiff had adequate attention and concentration, normal speech, an anxious effect, a goal directed thought process, and limited insight. (*Id.*). Although the record is not entirely clear, apparently Plaintiff began taking Lexapro, a psychiatric drug, as a result of the January 2007 evaluation, but in a later evaluation Plaintiff indicated that no change had occurred. (*Id.* at 315). In March 2007, Plaintiff's Lexapro dosage was increased, and during a May 2007 meeting with his treating psychiatrist it appears as though Plaintiff's medication dosage remained the same. (*Id.* at 403).

In May 2007, the state agency requested a consultative mental status evaluation of the Plaintiff, which was performed by Ernesto Perdomo, Ph.D. (*Id.* at 358-62). During his evaluation Plaintiff indicated that he was HIV positive since at least 1995, and had been diagnosed with AIDS in 2002. (*Id.* at 358). Plaintiff stated that he felt depressed and irritable, and experienced panic attacks twice per day. (*Id.* at 358-59). At the time of the evaluation, Plaintiff was taking Cymbalta, was attending group therapy, and was adhering to his monthly medication check schedule. (*Id.* at 359). Additionally, Plaintiff reported that he had four seizures per month despite his use of medication. (*Id.*). Plaintiff indicated that he stopped working in 1994 due to his seizure disorder. (*Id.*). In regards to his daily life, Plaintiff reported that he spent most of his days at home, but used public transportation to attend weekly bible study groups, HIV support groups, and Sunday church

services. (*Id.* at 360). He also stated that he cared for his personal needs and hygiene depending on his mood. (*Id.*).

In his report, Dr. Perdomo indicated that the Plaintiff had a depressed mood, but appeared to be casually dressed and well groomed. (*Id.*). Plaintiff was able to understand and follow moderately complex instructions. (*Id.*). The doctor also reported that Plaintiff spoke coherently and relevantly, denied hallucinations, had no evidence of thought disorder or psychosis, had an organized thought process, was well oriented, and had an appropriate affect. (*Id.*). Although Plaintiff's intelligence was in the very low average range, he had fair memory, adequate vocabulary, good concentration, and association and abstraction abilities. (*Id.*). Dr. Perdomo also reported that Plaintitff seemed to have an "underlying personality disorder." (*Id.* at 361). Following the evaluation, Plaintiff was given a GAF score of 50 to 55. (*Id.* at 362).

On May 31, 2007, Michael DAdamo, Ph.D. completed a Mental Residual Function Capacity (RFC) assessment for the Plaintiff. (*Id.* at 364-66). In reviewing the medical records and evidence provided, Dr. DAdamo found that Plaintiff was not significantly limited in setting realistic goals, sustaining an ordinary routine without special supervision, getting along with coworkers, or working in coordination or proximity to others. (*Id.*). Dr. DAdamo's assessment also indicated that Plaintiff was not significantly limited in making simple work related decisions, responding appropriately to changes in the work setting, or understanding, remembering, and carrying out detailed instructions. (*Id.*). Additionally, Dr. DAdamo found that Plaintiff has moderate limitations in completing a normal workweek, maintaining attention and concentration for extended periods, and performing activities within a schedule. (*Id.*). In evaluating the Plaintiff's RFC, Dr. DAdamo concluded that "despite some limitations in stress tolerance and concentration, he possesses the RFC [from] a psych viewpoint to adapt and be productive on a

6

job." (*Id.* at 366). Additionally, Dr. DAdamo concluded that Plaintiff was able to understand, retain, and execute simple instructions, as well as relate in an appropriate manner with others, and make social adaptions on the job. (*Id.*). In the RFC evaluation, Dr. DAdamo also concluded that the Plaintiff would be "best equipped for job tasks which do not demand a lot of mental effort." (*Id.*).

    C.    <u>Procedural History</u>

On December 15, 2006, Plaintiff filed an application with the Social Security Administration for supplemental security income. (*Id.* at 84-90). On his initial application, Plaintiff alleged that his disability began on October 20, 2006; however, the application was amended to reflect a closed period of disability from beginning on November 27, 2006 through April 15, 2009, the day prior to Plaintiffs return to work. (Pl.'s Br. 2). Plaintiff's application was initially denied, and denied again upon Reconsideration. (R. at 46-47). Plaintiff requested a hearing to review his application, which was held on July 20, 2009 before ALJ James Andres. (*Id.* at 26). On November 2, 2009, ALJ Andres issued a decision denying Plaintiff's application, finding that Plaintiff was not disabled because he retained the capacity to perform medium work activity. (*Id.* at 11-20). Following the unfavorable decision, Plaintiff sought Appeals Council review and was denied. (*Id.* at 1). Plaintiff then filed suit in this Court, and on March 30, 2011, the matter was remanded on consent for further review by an ALJ. (*Id.* at 552-53). The Appeals Council issued its Remand Order on January 25, 2012, and ordered that further consideration of the Plaintiff's RFC (Residual Function Capacity) was necessary. (*Id.* at 556-58).

On January 15, 2013, and June 14, 2013, hearings were held before ALJ Richard West. (*Id.* at 523-51). At the June 2013 hearing, a vocational expert was asked to determine whether a job in the national economy existed for a hypothetical individual of Plaintiff's education and age, with the limitations that he only perform medium work, avoid climbing ladders, ropes, and scaffolds,

7

avoid ordinary workplace hazards, have occasional interaction with the general public, and occasionally exercise independent decision making. (*Id.* at 534-35). The vocational expert determined and testified that the hypothetical individual could perform work as a meat clerk, kitchen helper, or hand packager. (*Id.*).

ALJ West issued a decision on July 19, 2013 denying Plaintiff's claim for supplemental security income, citing Plaintiff's ability to perform medium work. (*Id.* at 506-18). Plaintiff sought review of the decision, and on April 29, 2014, the Appeals Council denied Plaintiff's request, rendering the ALJ's decision the final decision of the Commissioner. (*Id.* at 500-02). As a result, Plaintiff appealed to this Court on July 3, 2014. (Compl., ECF No. 1). This Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g).

## II. LEGAL STANDARD

### A. The Five-Step Process for Evaluating Whether a Claimant Has a Disability

Under the Social Security Act, the Administration is authorized to pay disability insurance benefits to "disabled" persons. 42 U.S.C. §§ 423(a), 1382(a). A person is "disabled" if "he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A person is unable to engage in substantial gainful activity when his physical or mental impairments are "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . .." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

Regulations promulgated under the Social Security Act establish a five-step process for determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)(1), 416.920(a)(1). At step one, the ALJ assesses whether the claimant is currently performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(f), 416.920(a)(4)(i). If so, the claimant is not disabled and, thus, the process ends. 20 C.F.R. §§ 404.1520(a)(4)(f), 416.920(a)(4)(i). If not, the ALJ proceeds to step two and determines whether the claimant has a "severe" physical or mental impairment or combination of impairments. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Absent such impairment, the claimant is not disabled. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Conversely, if the claimant has such impairment, the ALJ proceeds to step three. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). At step three, the ALJ evaluates whether the claimant's severe impairment either meets or equals a listed impairment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If so, the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). Otherwise, the ALJ moves on to step four, which involves three sub-steps:

> (1) the ALJ must make specific findings of fact as to the claimant's [RFC]; (2) the ALJ must make findings of the physical and mental demands of the claimant's past relevant work; and (3) the ALJ must compare the [RFC] to the past relevant work to determine whether claimant has the level of capability needed to perform the past relevant work.

*Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 120 (3d Cir. 2000) (citations omitted). The claimant is not disabled if his RFC allows him to perform his past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). However, if the claimant's RFC prevents him from doing so, the ALJ proceeds to the fifth and final step of the process. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

The claimant bears the burden of proof for steps one through four. *Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 92 (3d Cir. 2007) (*citing Ramirez v. Barnhart*, 372 F.3d 546, 550 (3d Cir.

2004). "At step five, the burden of proof shifts to the . . . Administration to show that the claimant is capable of performing other jobs existing in significant numbers in the national economy, considering the claimant's age, education, work experience, and [RFC]." *Id.* (*citing Ramirez*, 372 F.3d at 551).

### B. The Standard of Review: "Substantial Evidence"[2]

This Court must affirm an ALJ's decision if it is supported by substantial evidence. *See* 42 U.S.C. §§ 405(g), 1383(c)(3). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (*quoting Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). To determine whether an ALJ's decision is supported by substantial evidence, this Court must review the evidence in its totality. *Daring v. Heckler*, 727 F.2d 64, 70 (3d Cir. 1984). However, this Court may not "weigh the evidence or substitute its conclusions for those of the fact-finder." *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992) (citation omitted). Consequently, this Court may not set an ALJ's decision aside, "even if [it] would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999) (citations omitted).

### III. DISCUSSION

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity throughout the relevant time period. (R. at 511). At step two, the ALJ found that Plaintiff had four

---

[2] Because the regulations governing supplemental security income—20 C.F.R. § 416.920—are identical to those covering disability insurance benefits—20 C.F.R. § 404.1520—this Court will consider case law developed under both regimes. *Rutherford v. Barnhart*, 399 F.3d 546, 551 n. 1 (3d Cir. 2005) (citation omitted).

severe impairments: (1) HIV, (2) Hepatitis C, (3) depression, and (4) seizures. (*Id.* at 512). At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments. (*Id.*). At step four, the ALJ found that Plaintiff had the RFC to perform medium work, with the exceptions that he could not climb ladders, ropes, or scaffolds, and that he should avoid all ordinary workplace hazards. (*Id.* at 513-16). The ALJ then concluded that the Plaintiff had no past relevant work history. Lastly, at step five, the ALJ found that, considering Plaintiff's age, education, work experience, and RFC, there were a significant number of jobs existing in the national economy that Plaintiff could perform. (*Id.* at 516).

Plaintiff contends that the ALJ's description of the procedural history in his decision is incorrect, and that on this basis alone remand is necessary. (Pl.'s Br. 10-13). In addition, Plaintiff contends that the ALJ erred at steps three and four of his analysis, and therefore his decision should be reversed or in the alternative, remanded for further review. (Pl.'s Br. 13-25).

The Court will address Plaintiff's arguments related to the procedural history and step three of the ALJ's analysis. Because the Court finds merit in Plaintiff's contention that the ALJ's determination at step three was not based on substantial evidence, the Court need not address Plaintiff's arguments relating to step four of the ALJ's analysis.

    A.    <u>Any Error in Description of Procedural History is Harmless</u>

Plaintiff contends that remand is appropriate due to the ALJ's lack of accuracy in the procedural history portion of his decision. (Pl's. Br. 10-13). Plaintiff alleges that the ALJ intentionally avoided providing details of Plaintiff's absences, as well as an accurate description of the procedural history, in order to present a more favorable depiction that would support his decision. (Pl's. Br. 13).

The ALJ's decision states that Plaintiff failed to appear at a scheduled hearing on May 8, 2012, and then again when the hearing was rescheduled for October 16, 2012. (R. at 509). The decision further reads that Plaintiff was not present at the June 14, 2013, and that pursuant to the Social Security Administration regulations, the ALJ determined that Plaintiff was a nonessential witness. (*Id.*). The ALJ's decision states that June hearing proceeded without Plaintiff, but with representation by his attorney, James Langton. (*Id.*).

The administrative record and transcript reflect that the ALJ's description of the procedural history in this matter is inaccurate. The record indicates that the ALJ, in his procedural history portion of the decision, failed to mention a January 15, 2013 hearing in which Plaintiff failed to appear. Additionally, the transcript indicates that Plaintiff was, in fact, present at the June 14, 2013 hearing. The transcript also shows that at the June 14, 2013 hearing, a discussion between the ALJ and Plaintiff's attorney took place regarding Plaintiff's ability to testify. Both the ALJ and Plaintiff's attorney decided that Plaintiff's testimony would not be valuable due to his physical condition[3] and the large lapse in time between the filing of the application and the hearing.

Although the ALJ's description of the procedural history is not entirely accurate, Plaintiff has the burden of showing how the error harmed him. *See Shinseki v. Sanders*, 556 U.S. 396, 409 (2009). "[T]he burden of showing that an error is harmful normally falls upon the part attacking the agency's determination." (*Id.*). Here, Plaintiff has failed to articulate an argument as to how the ALJ's errors harmed him. Plaintiff contends that the ALJ deliberately altered his rendition of the procedural history to prejudice the Plaintiff, but has proffered no evidence to substantiate his speculation in this regard; thus this Court finds this contention has no merit. The Plaintiff also argues that the ALJ should have explained the reasons for Plaintiff's absence at the various

---

[3] The record indicates that Plaintiff suffered a stroke between 2011 and 2012. (R. at 526).

hearings, however no statute or regulation requires the ALJ to do so. Furthermore, Plaintiff argues that he was harmed because he was not afforded the opportunity to testify at his hearing. However, evidence in the record shows that Plaintiff's counsel had the opportunity to call upon Plaintiff for testimony, but declined to do so. (R. at 528). Because Plaintiff's counsel declined to have Plaintiff testify at the hearing, any harm that could have come from the ALJ's error in describing the procedural history was rendered moot. (R. at 528). Although the ALJ's decision may not have accurately set forth the procedural history of this case, this Court finds that the errors were harmless and did not affect the outcome of the decision. *See Fisher v. Bowen,* 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result"); *Senne v. Apfel,* 198 F.3d 1065, 1067 (8th Cir. 1999) ("We have consistently held that a deficiency in opinion-writing is not a sufficient reason for setting aside an administrative finding where the deficiency had no practical effect on the outcome of the case."). Accordingly, this Court declines to remand this matter based upon any procedural inaccuracies.

    B.    <u>Whether the ALJ's Step Three Finding is Based on Substantial Evidence</u>

Plaintiff does not challenge the ALJ's findings at step one or two of his analysis. However, Plaintiff makes several arguments in support of his contention that the ALJ's step three analysis is flawed. (Pl.'s Br.13-15). First, Plaintiff claims that the ALJ failed to consider Plaintiff's Hepatitis C diagnosis in conjunction with his HIV diagnosis as an opportunistic disease. (*Id.*). Plaintiff also argues that although the ALJ decided that his Hepatitis C was a severe impairment at step two, at step three of the analysis, the ALJ failed to mention anything about the Hepatitis C diagnosis. Additionally, Plaintiff contends that the ALJ did not consider all of his severe impairments in

combination while comparing them to the Listings to determine whether the severity of the impairment or combination thereof equaled or medically equaled a Listed Impairment. (*Id.*).

### 1. Hepatitis C is Not a Listed Opportunistic Disease

Plaintiff argues that the ALJ failed to consider his Hepatitis C in conjunction with his HIV, in comparison to the Listed Impairments. (*Id.*). Specifically, Plaintiff asserts that Listing 14.08(d)(5) requires the ALJ to deem a person with HIV and opportunistic disease, such as Hepatitis C, disabled. (*Id.*). However, Hepatitis C is no longer listed as an opportunistic disease in Listing 14.08. 20 C.F.R § 404 Subpart P, Appendix 1 Listing 14.08. Therefore, any argument that the ALJ should have viewed Plaintiff's Hepatitis C as an opportunistic disease coupled with Plaintiff's HIV is without merit.

### 2. The ALJ Failed to Compare Plaintiff's Severe Impairment of Hepatitis C to the Listed Impairments

At step three, if the Plaintiff's impairment or group of impairments is found to be one of the Listed Impairments, or is found to be the medical equivalent of a Listed Impairment, then the claimant is automatically deemed disabled. 20 C.F.R § 404.1520(e). Here, in conducting his step three analysis, the ALJ found that Plaintiff's severe medical impairments did not meet or medically equal one of the Listed Impairments, but he failed to provide reasons for this determination specifically with respect to Plaintiff's Hepatitis C impairment. (R. at 512-13).

Defendant argues that even though the ALJ did not explicitly address the Hepatitis C impairment in his step three analysis, the error was harmless because Plaintiff does not meet the requirements of the Listings. (Pl's. Br. 13).

In this circuit, it is well established law that in making a decision at step three of the analysis, the ALJ must indicate the evidence he found persuasive, and that which he rejected, as well as his reasons for doing so. *See Cotter*, 642 F.2d at 705-07. In other words, "[t]he ALJ has a

14

duty to hear and evaluate all relevant evidence in order to determine whether an applicant is entitled to disability benefits. The ALJ's decision must be in writing and contain findings of fact and a statement of reasons in support thereof." *(Id.* at 704). In this regard, the ALJ is required to "fully develop the record and explain his finding at step three, including an analysis of whether and why [each of the Plaintiff's] impairments, or those impairments combined, are or are not equivalent in severity to one of the listed impairments." *Burnett,* 220 F.3d at120. The ALJ is not required to use specific language or cite to specific to Listings in his step three analysis. *Jones v. Barnhart,* 364 F.3d 501, 505 (3d Cir. 2004). However, the ALJ's decision "read as a whole" must permit meaningful judicial review of its step three determination by developing the record and explaining its findings. *Id.*

Here, at step two of his analysis, the ALJ found that Plaintiff had the severe impairments of HIV, Hepatitis C, seizures, and depression. (R. at 512). At step three, the ALJ stated that Plaintiff's impairment or combination of impairments did not meet or medically equal the severity of one of the Listed Impairments. (*Id.*). The ALJ laid out his reasoning as to why Plaintiff's HIV, seizures, and depression did not meet or equal a listed impairment, but he did not mention Plaintiff's Hepatitis C impairment, or, in particular, *why* the Hepatitis C impairment did or did not meet or equal a listed impairment. (*Id.*). At step four of his analysis the ALJ states that "[a]lthough the [Plaintiff] suffered HIV, a seizure disorder, and Hepatitis C, there is no evidence which demonstrates that his condition was completely disabling during his alleged closed period." (R. at 514). Notably, the ALJ's step four analysis explicitly references Hepatitis C, but does not indicate what evidence, if any, was weighed in regards to Plaintiff's Hepatitis C at step three. Read as a whole, the entire decision does not indicate whether any consideration was given to Plaintiff's Hepatitis C at step three.

15

"In *Burnett*, this circuit held that an ALJ's determination would be set aside if it 'merely stated a summary conclusion that [Plaintiff's] impairments did not meet or equal any Listed Impairment', without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." 220 F.3d at 119 (*quoting Clifton v. Chater*, 79 F.3d 1007 (10th Cir. 1981*)*). Here, the ALJ did not make a summary conclusion, and did in fact explain his reasoning for Plaintiff's severe impairments of HIV, depression, and seizures. However, the ALJ neglected to fully explain whether or not any consideration was given to Plaintiff's Hepatitis C diagnosis in his step three analysis, or anywhere in his decision. Omitting a relevant impairment entirely without discussing any evidence or explaining the reasoning behind the omission is akin to the summary conclusion *Burnett* precludes. (*Id.*). Because of this omission, this Court has no way of assessing whether the ALJ's determination at step three was based upon substantial evidence given that there is no indication before the Court whether the ALJ weighed, accepted, or dismissed any evidence regarding Plaintiff's Hepatitis C. Therefore, the Court will remand this case for a discussion of the evidence and an explanation of his reasoning supporting a determination regarding whether Plaintiff's Hepatitis C does or does not meet or medically equal a listed impairment. "On remand, the ALJ shall fully develop the record and explain his findings at step three, including an analysis of whether and why [Plaintiff's Hepatitis C] impairment[], or [Plaintiff's] impairments combined, are or are not equivalent in severity to one of the listed impairments." *Lopez v. Colvin*, No. 12-7238, 2013 U.S. Dist. 134929, at *12 (D.N.J. Sept. 20, 2013) (*citing Burnett*, 220 F.3d 120).

## IV. CONCLUSION

The Court has reviewed the entire record, and for the reasons discussed above, finds that the ALJ's determination at step three—that Plaintiff's severe impairments did not meet or medically equal a listed impairment—is not supported by substantial evidence. Accordingly, the Court remands this matter to the ALJ. On remand, the Court directs the ALJ to consider all Plaintiff's impairments at step three, and to explain his findings specifically regarding Plaintiff's Hepatitis C diagnosis. If the ALJ determines that Plaintiff has a severe impairment or combination of severe impairments that meet or medically equal a listed impairment, the ALJ is further directed to continue on with the sequential evaluation process. An appropriate Order accompanies this opinion.

Date: March  /8  2015

Jose L. Linares, U.S.D.J.